# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40189 (rem)**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Kristopher D. COLE**
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————

On Remand from
The United States Court of Appeals for the Armed Forces

Decided 6 February 2025

———————————

*Military Judge*: Brett A. Landry (arraignment and motions); Mark W. Milam.

*Sentence*: Sentence adjudged 15 June 2021 by GCM convened at Davis-Monthan Air Force Base, Arizona. Sentence entered by military judge on 19 August 2021:[1] Bad-conduct discharge, confinement for 14 months, and reduction to E-1.

*For Appellant*: Major Samantha P. Golseth, USAF.

*For Appellee*: Major Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, ANNEXSTAD, and KEARLEY, *Appellate Military Judges.*

Senior Judge RICHARDSON delivered the opinion of the court, in which Senior Judge ANNEXSTAD and Judge KEARLEY joined.

———————————

---

[1] This is the date of the military judge's electronic signature on the entry of judgment. The date listed on the top of the entry of judgment is "15 June 2021."

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

––––––––––––––––––

RICHARDSON, Senior Judge:

Appellant's case is before this court for the second time. A general court-martial comprised of a military judge convicted Appellant, in accordance with his pleas and pursuant to a plea agreement (PA), of three specifications involving assault upon RL in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[2] The military judge sentenced Appellant to a bad-conduct discharge, 14 months' confinement, reduction to the grade of E-1, and a reprimand. The PA required that the military judge impose confinement between 60 days and 6 months for each specification, with terms of confinement to be served consecutively.[3] The convening authority disapproved the reprimand and approved the remainder of the sentence adjudged.

In his initial appeal to this court, Appellant raised two assignments of error, claiming: "(1) Appellant's trial defense counsel were ineffective 'for at least six reasons, . . . '" and "(2) the military judge's failure to conduct further inquiry into Appellant's [traumatic brain injury (TBI)] made his pleas of guilty improvident." *See United States v. Cole*, No. ACM 40189, 2023 CCA LEXIS 118, at *2 (A.F. Ct. Crim. App. 6 Mar. 2023) (unpub. op.), *rev'd in part*, 84 M.J. 398, 407 (C.A.A.F. 2024).

After receiving the pleadings by Appellant and the Government, this court specified two issues for the parties to brief: (3) whether Appellant's plea of guilty to Specification 2 of Charge II (simple assault with an unloaded firearm) was improvident because the military judge misadvised Appellant of the nature and the elements of the offense, and (4) whether Appellant is entitled to relief because the military judge misapprehended the offense in Specification 2 of Charge II for which he sentenced Appellant. *Id.* at *3. Appellant was charged with simple assault with an unloaded firearm, but the military judge confused this offense with assault with a dangerous weapon. *See id.* at *44–45. We found "that while the military judge made errors during his providence inquiry with Appellant, such errors did not substantially influence Appellant's

––––––––––––––––––

[2] Unless otherwise noted, all references in this opinion to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] Thus, the PA required that the military judge impose a total amount of confinement between about 6 months and 18 months. Additionally, it prohibited the military judge from imposing a dishonorable discharge.

adjudged sentence." *Id.* at *57–58 (footnote omitted). We affirmed the findings and sentence. *Id.* at *58.

The United States Court of Appeals for the Armed Forces (CAAF) disagreed: "In this case, the military judge's erroneous view of the elements of the offense may have led him to sentence Appellant for the offense of aggravated assault with a dangerous weapon, an offense for which Appellant was not found guilty." *United States v. Cole*, 82 M.J. 398, 407 (C.A.A.F. 2024). The CAAF affirmed our decision as to the findings, but reversed as to sentence, and returned the record for remand to this court "to reassess the sentence or to order a rehearing on the sentence, as appropriate." *Id.*

On remand to this court, the parties submitted briefs addressing whether this court should reassess the sentence or order a rehearing on the sentence. The Government argued for the former; Appellant argued for the latter. We conclude that reassessment is appropriate, and we take corresponding action in our decretal paragraph.

## I. BACKGROUND

We detailed the facts underlying Appellant's convictions in our previous opinion, and restate most of those facts here.

> At the time of the offenses, Appellant and RL were assigned to the same squadron at Davis-Monthan Air Force Base, Arizona. All the offenses occurred at Appellant's home, which he shared with three Airmen. RL "liked" Appellant; however, Appellant "did not want a relationship with her, but said that he would be willing to be sexually intimate with her." "[RL] enjoyed grappling, or 'play wrestling' with [Appellant]." She would initiate these sessions with Appellant "by annoying him." If he was "wrestling her for fun," he would let her tap out—stop after she tapped him on the arm; other times, Appellant would not stop and he would "hurt her."

*See Cole*, unpub. op. at *3–4, n.5.

## A. Strangulations

Appellant was convicted of strangling RL multiple times.

> Appellant admitted as fact that he strangled RL "at least five separate times." The first two times were around 14 September 2019. RL was teasing Appellant about taking his car for a drive. Appellant became angry and put RL in a chokehold from behind until she lost consciousness. During the strangulation, RL felt a burning sensation in her throat and started to panic because she

could not breathe. She asked Appellant to stop multiple times and tried tapping out, but Appellant did not stop. "She thought she was going to die." When RL awoke, she found Appellant in a different room. She asked what happened, and he said, "[Y]ou passed out, so I dropped you to the floor. You woke up like two minutes later." About 10 minutes later, for no apparent reason Appellant strangled RL a second time, again using a chokehold and until RL lost consciousness. "After this second strangulation, [RL] asked [Appellant] why he did that, again. He replied, '[J]ust cause.' Then he elaborated, saying, 'I'm not gonna do that again [be]cause it can cause serious brain damage.'"

Appellant strangled RL again three or four more times, however, each witnessed by one or more Airmen. On one occasion, Appellant pinned RL to the ground facing him, and used his forearm to strangle her. After RL's face turned red, an Airman "ran over to [Appellant] and pushed on his head to get him to stop strangling [RL]." Another time, a different Airman, AW, witnessed Appellant use a chokehold to strangle RL. AW confronted Appellant, who "laughed about strangling [RL]." Witnesses said when RL "tried to tap out, [Appellant] would not let her go."

*Id.* at *4–5.

The last charged strangulation took place in Appellant's kitchen, among friends, while playing a game. "While losing to Appellant's team in beer pong, RL 'was playfully upset' and Appellant got angry. Appellant put RL in a chokehold like before, but 'this time it seemed like he also lifted her up, so that only the tips of her toes were still touching the ground.'" *Id.* at *5. As stipulated by Appellant, RL considered this strangulation as more severe than the others:

[RL] felt more pain. Her inability to breathe this time felt like if a person were to hold their breath and their face feels tight, with accumulating pressure in their face. She felt a lot of pressure in her head, and felt like her eyes were going to pop out of her face. She felt his arm squeezing on her neck and it felt like it was pulling her neck up, making it longer. This time, she passed out much quicker than the previous strangulations. [RL] would testify that in her opinion this strangulation felt worse than the others because [Appellant] employed not only a manual form of strangulation, with his forearm, but also a hanging form of strangulation, by lifting her body weight up, causing additional pressure to accumulate in her head.

*Id.* at \*5–6. When RL regained consciousness, she had a severe headache. She also "felt very dizzy and confused." *Id.* at \*6. Appellant told RL that her face turned purple, and that she had been foaming at the mouth and seizing. One Airman, WC, witnessed the strangulation and saw RL's face turn purple. Additionally, "at one point that night, [Appellant] bragged to [WC] that he had strangled [RL] to the point of passing out four to five times, assuring [WC] that [RL] would be fine that night." *Id.* "Each time [RL] had an altered state of consciousness or lost consciousness, the risk of irreparable damage to her brain and body increased." *Id.*

## B. Firearm Incident

As we stated in our previous opinion, Appellant was "a self-described 'firearms enthusiast;' RL 'was not familiar with firearms.'"

> About a week after the first strangulation, Appellant "handed [RL] his Kriss Vector rifle to disassemble and reassemble." RL was struggling to reassemble the rifle precisely, told Appellant she was tired, and "asked if she could just go to bed." Appellant became angry. He yelled at RL as she sat on the couch where she had been reassembling the rifle. Appellant "walked over to [RL] and held up his 9mm Smith and Wesson pistol . . . to her temple." "He yelled, '[D]on't disrespect me in my own house, you are going to do this. My house, my rules, you are going to finish it, that's what I told you to do!' [RL] was terrified." Unbeknownst to RL, Appellant had pulled the firing pin out of the pistol. Appellant later told one of his roommates "that he pulled the trigger when he held the pistol to [RL's] temple." Appellant told another person that "he did it to 'put pressure on [RL] and to make her go faster.'" When AW confronted Appellant about whether he really held up a pistol to RL's temple, Appellant "said he did, and said it was funny."

*Id.* at \*6–7.

## C. Shoulder Incident

The last incident, involving RL's shoulder, occurred in mid-January 2020.

> Appellant and RL were consensually grappling. After RL tapped out, "[Appellant] took her arm and elbow and twisted it behind her back." Appellant "held [RL's] arm in a 90-degree bend behind her back and he was pushing her hand into her own shoulder blade, moving her arm further upwards." The incident was "excruciatingly painful" for RL. AW was present and heard RL's shoulder make "popping and cracking noises." AW "had to jump in to stop [Appellant]." RL later obtained medical treatment for

her shoulder. Before this incident, Appellant knew RL had a prior shoulder injury.

*Id.* at *7–8.

## II. DISCUSSION

### A. Law

Under Article 59(a), UCMJ, 10 U.S.C. § 859(a), a court-martial sentence may not be held incorrect by virtue of legal error "unless the error materially prejudices the substantial rights of the accused." If a Court of Criminal Appeals (CCA) can conclude that an adjudged sentence would have been of at least a certain severity absent any error, "then a sentence of that severity or less will be free of the prejudicial effects of error; and the demands of Article 59(a)[, UCMJ,] will be met." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

CCAs have broad discretion first to decide whether to reassess a sentence, and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013). In deciding whether to reassess a sentence or return a case for a rehearing, we consider the totality of the circumstances including the following factors: (1) "[d]ramatic changes in the penalty landscape and exposure;" (2) whether the appellant was sentenced by court members or a military judge; (3) "[w]hether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "[w]hether the remaining offenses are of the type that judges of the [CCAs] should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Id.* at 15–16 (citations omitted). These factors are "illustrative, but not dispositive, points of analysis" to be considered as part of "the totality of the circumstances presented." *Id.* at 15. If we cannot determine that the sentence would have been at least of a certain magnitude, we must order a rehearing. *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000) (citation omitted).

The maximum period of confinement for simple assault with an unloaded firearm is three years. *See Manual for Courts Martial* (2019 ed.) (*MCM*), pt. IV, ¶ 77.d.(1)(b). The maximum period of confinement for aggravated assault with a dangerous weapon is eight years. *See MCM*, pt. IV, ¶ 77.d.(3)(a).

### B. Analysis

We have considered the *Winckelmann* factors, and determine reassessment is appropriate.

With Appellant's PA and the affirmed findings of guilty, the penalty landscape and exposure have not changed. The maximum punishment under the terms of the PA included 18 months' confinement, a bad-conduct discharge, and reduction to the grade of E-1; the minimum punishment included 180 days' confinement and no punitive discharge.

The military judge did not miscalculate the maximum punishment authorized based solely on Appellant's pleas of guilty—six years and six months. *Cole*, unpub. op. at *56–57. His adjudged sentence was at the higher end of the PA's range, to include 14 months' confinement, a bad-conduct discharge, reduction to the grade of E-1, and a reprimand.

The military judge may have sentenced Appellant for an offense which he believed required an intent to do bodily harm and use of a dangerous weapon. However, he appears to have understood the essence of the crime Appellant committed—pointing an unloaded firearm at the victim.

We are confident Appellant would have been sentenced to at least six months' confinement for the offense of simple assault with an unloaded firearm. Appellant terrified RL and amused himself by pointing a firearm at her, yelling at her, and then pulling the trigger while holding the firearm at her temple. In our reassessment of the term of confinement, we do not alter the determination that it and the other terms of confinement be served consecutively. We need not disturb those other terms: six months' confinement for the strangulation incident and two months' confinement for the shoulder incident.

We have considered the other components of the adjudged sentence—bad-conduct discharge and reduction to the grade of E-1—and determine, based on the totality of the circumstances, Appellant's sentence would have at least included those punishments as well as 14 months' confinement had the military judge accurately apprehended all the convicted offenses.

## III. CONCLUSION

The findings of guilty previously were affirmed. We reassess the sentence of confinement for simple assault with an unloaded firearm offense—Specification 2 of Charge II—to six months, to run consecutively with the other adjudged periods of confinement. We reassess the sentence to a bad-conduct discharge, confinement for 14 months, and reduction to the grade of E-1. The sentence as reassessed is correct in law and fact, and no additional error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

The sentence as reassessed is **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court